# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ALABAMA
### NORTHERN DIVISION

| | |
|---|---|
| MORRIS POLION, | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| v. | ) CIVIL ACTION 13-0244-WS-M |
| | ) |
| THE CITY OF GREENSBORO, et al., | ) |
| | ) |
| **Defendants.** | ) |

## ORDER

This matter is before the Court on the defendants' motion for summary judgment. (Doc. 33). The parties have filed briefs and evidentiary materials in support of their respective positions, (Docs. 34-36, 42, 45), and the motion is ripe for resolution.[1] After careful consideration, the Court concludes that the motion is due to be granted in part and denied in part.

## BACKGROUND

According to the amended complaint, (Doc. 19), the plaintiff was employed as a police officer by the defendant City of Greensboro ("the City"). Defendants Willie Hudson and Michael Hamilton were the chief and assistant chief,

---

[1] The defendants' motion to supplement their evidentiary submission, (Doc. 44), is **denied**. The defendants seek to submit an amended affidavit to correct an alleged error in the original version, but doing so could not eliminate the fact issue created by the original. The defendants also seek to introduce an affidavit which, according to their own citations, (Doc. 39), was in their possession over a month before their motion was filed and almost three weeks before the plaintiff's brief was filed. "Absent extenuating circumstances (which are not present here), the time for submitting a summary judgment record is contemporaneously with the filing of the principal brief, not after the non-movant has already filed a response and briefing has closed." *Sideraulic System SpA v. Briese Schiffahrts GmbH & Co.*, 2011 WL 3204521 at *2 (S.D. Ala. 2011). The proffered evidence, even were it accepted, would not and could not alter the Court's ruling on motion for summary judgment.

respectively, of the City police department. The plaintiff complained to the mayor and two city council members about ineptitude, malfeasance and possible unlawful behavior by Hudson and Hamilton. At some point, Hudson and Hamilton learned of the plaintiff's complaints and began retaliating against him with respect to various working conditions. In the summer of 2012, the plaintiff's employment was terminated.

The amended complaint includes four counts, all of which name the City as a defendant and all but the last of which also name Hudson and Hamilton as defendants. Count One alleges that the defendants terminated the plaintiff in retaliation for his exercise of First Amendment rights.[2] Count Two alleges that the defendants violated the plaintiff's equal protection and due process rights. Count Three alleges that the individual defendants committed the tort of outrage under Alabama law and that the City authorized, ratified and/or condoned their conduct. Count Four alleges that the City negligently or maliciously retained, supervised and trained Hudson and Hamilton. The defendants seek summary judgment as to all counts.

## DISCUSSION

Summary judgment should be granted only if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party seeking summary judgment bears "the initial burden to show the district court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial." *Clark v. Coats & Clark, Inc.,* 929 F.2d 604, 608 (11th Cir. 1991). The moving party may meet its burden in either of two ways: (1) by "negating an element of the non-moving party's claim"; or (2) by "point[ing] to materials on file that demonstrate that the

---

[2] Contrary to the defendants' understanding, (Doc. 35 at 14-15), Count One does not extend to forms of retaliation short of termination. By its terms, Count One alleges only that "the Defendants retaliated against [the plaintiff] … by terminating him." (Doc. 19 at 5).

party bearing the burden of proof at trial will not be able to meet that burden." *Id*. "Even after *Celotex* it is never enough simply to state that the non-moving party cannot meet its burden at trial." *Id*.; *accord Mullins v. Crowell*, 228 F.3d 1305, 1313 (11th Cir. 2000); *Sammons v. Taylor*, 967 F.2d 1533, 1538 (11th Cir. 1992).

"When the *moving* party has the burden of proof at trial, that party must show *affirmatively* the absence of a genuine issue of material fact: it must support its motion with credible evidence ... that would entitle it to a directed verdict if not controverted at trial. [citation omitted] In other words, the moving party must show that, on all the essential elements of its case on which it bears the burden of proof, no reasonable jury could find for the nonmoving party." *United States v. Four Parcels of Real Property*, 941 F.2d 1428, 1438 (11th Cir. 1991) (en banc) (emphasis in original); *accord Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993).

"If the party moving for summary judgment fails to discharge the initial burden, then the motion must be denied and the court need not consider what, if any, showing the non-movant has made." *Fitzpatrick*, 2 F.3d at 1116; *accord Mullins*, 228 F.3d at 1313; *Clark*, 929 F.2d at 608.

"If, however, the movant carries the initial summary judgment burden ..., the responsibility then devolves upon the non-movant to show the existence of a genuine issue of material fact." *Fitzpatrick*, 2 F.3d at 1116. "If the nonmoving party fails to make 'a sufficient showing on an essential element of her case with respect to which she has the burden of proof,' the moving party is entitled to summary judgment." *Clark*, 929 F.2d at 608 (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)) (footnote omitted); *see also* Fed. R. Civ. P. 56(e)(2) ("If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may … consider the fact undisputed for purposes of the motion ….").

In deciding a motion for summary judgment, "[t]he evidence, and all reasonable inferences, must be viewed in the light most favorable to the

nonmovant ...." *McCormick v. City of Fort Lauderdale*, 333 F.3d 1234, 1243 (11th Cir. 2003).

There is no burden on the Court to identify unreferenced evidence supporting a party's position.[3] Accordingly, the Court limits its review to the exhibits, and to the specific portions of the exhibits, to which the parties have expressly cited. Likewise, "[t]here is no burden upon the district court to distill every potential argument that could be made based upon the materials before it on summary judgment," *Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995), and the Court accordingly limits its review to those arguments the parties have expressly advanced.

## I. First Amendment.

In the spring of 2012, the plaintiff responded to a domestic disturbance call at an apartment complex, which ended with the plaintiff moving a television from the apartment to another apartment across the hall. The female occupant claimed the television was hers and ultimately lodged a complaint with Hamilton. Hudson investigated the incident and recommended that the plaintiff be terminated. At the plaintiff's request, a pre-disciplinary hearing was held before a three-person grievance committee. After hearing testimony from the complainant, the plaintiff and Hudson, the grievance committee recommended termination, and the city council accepted the recommendation. The plaintiff asserts that Hudson's recommendation and testimony were in retaliation for the exercise of his free speech rights. (Doc. 42 at 15).

For a public employee to sustain a claim of retaliation for protected speech under the First Amendment, the employee must show

_____

[3] Fed. R. Civ. P. 56(c)(3) ("The court need consider only the cited materials, but it may consider other materials in the record."); *accord Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 672 (10th Cir. 1998) ("The district court has discretion to go beyond the referenced portions of these [summary judgment] materials, but is not required to do so.").

by a preponderance of the evidence these things:

> (1) the employee's speech is on a matter of public concern; (2) the employee's First Amendment interest in engaging in the speech outweighs the employer's interest in prohibiting the speech to promote the efficiency of the public services it performs through its employees; and (3) the employee's speech played a substantial part in the employer's decision to demote or discharge the employee.

*Battle v. Board of Regents*, 468 F.3d 755, 760 (11th Cir. 2006) (internal quotes omitted). "Once the employee succeeds in showing the preceding factors, the burden then shifts to the employer to show, by a preponderance of the evidence, that it would have reached the same decision … even in the absence of the protected conduct." *Id*. (internal quotes omitted); *accord Bryson v. City of Waycross*, 888 F.2d 1562, 1565-66 (11th Cir. 1989). The defendants argue the plaintiff cannot establish any of the three listed elements and that they have established the plaintiff would have been fired regardless of his speech.

The plaintiff identifies his protected speech as addressing the following matters. First, that Hudson, immediately following a fatal shooting by the grandson of his good friend, declared the shooting to be in self-defense and thereafter obstructed an investigation into the shooting, including by advising the shooter (and the person who supplied him the gun) to leave town. Second, that Hudson and Hamilton found marijuana in a car, kept the marijuana but released the vehicle's driver, and thereafter failed to file a report accounting for the marijuana they had seized. Third, that Hudson on multiple occasions acted unnecessarily aggressively, including by striking several citizens (on the head and elsewhere) with his flashlight and by using pepper spray on high school students. The plaintiff states that he reported this conduct to the mayor and to two city council members. (Doc. 42 at 3-4, 11; Plaintiff Deposition at 48-49, 60-61, 64-67, 69, 77-78, 127-30, 146-56, 167-68).

**A. Public Concern.**

Whether a plaintiff was speaking as a citizen on a matter of public concern is a question of law for the Court to decide. *Vila v. Padron*, 484 F.3d 1334, 1339 (11th Cir. 2007). But the Court must do so in light of the evidence presented, the arguments raised and supported, and with due regard for the threshold burden that Rule 56 places on the defendants.

The defendants first invoke *Garcetti v. Ceballos*, 547 U.S. 410 (2006), which "hold[s] that when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Id.* at 421. With no analysis or explanation, the defendants posit that "such was the case with Polion." (Doc. 35 at 18). The defendants offer neither an evidentiary rendition of what the plaintiff's official duties were nor a legal analysis of what constitutes speaking "pursuant to [one's] official duties" under *Garcetti*.[4] The defendants' raw ipse dixit is wholly inadequate to carry their initial burden, or to cast any burden on the plaintiff to respond or on the Court to develop and support an argument on their behalf.

> To determine whether [a] statement receives First Amendment protection we must decide whether [the plaintiff] spoke … as a citizen on a matter of public concern or as an employee upon matters of personal interest. [citation omitted] To do this, we look to the content, form, and context of a given statement, as revealed by the whole record. [citation omitted] We ask whether the main thrust of the speech in question is essentially public in nature or private, whether the speech was communicated to the public at large or privately to an individual, and what the speaker's motivation in speaking was.

---

[4] The Court notes that the plaintiff in *Garcetti*, a prosecutor, had "a responsibility to advise his supervisor about how best to proceed with a pending case," such that his recommendation that a prosecution be dismissed was made pursuant to his official duties. 547 U.S. at 414, 421. The defendants have identified no evidence that the plaintiff's job duties as a police officer included reporting misconduct by the police chief and assistant chief. The Court also notes the Supreme Court's skepticism of written job descriptions as "neither necessary nor sufficient to demonstrate that conducting the task [at issue] is within the scope of the employee's professional duties for First Amendment purposes." *Id.* at 425.

*Vila*, 484 F.3d at 1340 (internal quotes omitted).  Since "[a]n employee's speech will rarely be entirely private or entirely public[, …] we consider whether the speech at issue was made primarily in the employee's role as citizen, or primarily in the role of employee."  *Morgan v. Ford*, 6 F.3d 750, 755 (11th Cir. 1993) (internal quotes omitted).

According to the defendants, these factors reflect that the plaintiff spoke primarily as an employee on matters of personal interest.  They say the plaintiff was "complaining about his work environment," that he spoke only privately, and that he was motivated by self-interest because "he was angry over the job assignment change, occurring several years back, and it was in his personal interest for the chief to be displaced."  (Doc. 35 at 16-18).

## 1.  Content.

As noted above, the plaintiff bases his claim on statements he made concerning alleged obstruction of justice, mishandling of contraband, and use of excessive force.  The defendants do not explain how these matters could possibly be viewed as mere complaints by the plaintiff about his work environment.[5]  In *Fikes v. City of Daphne*, 79 F.3d 1079 (11th Cir. 1996), the Court held that a complaint alleged speech on a matter of public concern when it alleged the plaintiff "was fired because he reported police misconduct (i.e., failure to terminate a dangerous, high-speed chase, and improper use of a confiscated

---

[5] The defendants acknowledge the plaintiff says he made these complaints, (Doc. 35 at 4-5), so they are not speaking from ignorance.  The defendants do say the plaintiff also complained (vaguely) about how Hudson treated officers and how he promoted an officer to sergeant ahead of more qualified officers, (*id*.), but the plaintiff does not rely on those statements in support of his claim.  (Doc. 42 at 4, 11).  Even had he done so, the Court would be required to ignore them in its calculus of whether the plaintiff spoke on a matter of public concern.  *E.g., Kurtz v. Vickrey*, 855 F.2d 723, 728 (11th Cir. 1988) ("Although we agree with the district court that a substantial portion of [the plaintiff's] expressions related to matters not properly characterized as relating to public concern, we cannot say that all of his speech failed to meet this threshold test.").

vehicle)." *Id*. at 1084. "Certainly, the question of whether police officers are properly performing their duties, as a public safety issue, must be considered an issue of political or social concern." *Id*.[6] Likewise, "[t]here can be no doubt that corruption in a police department is an issue of public concern." *Cooper v. Smith*, 89 F.3d 761, 765 (11th Cir. 1996). The plaintiff relies on *Fikes* and *Cooper*, (Doc. 42 at 10-11), yet the defendants ignored these cases in their reply brief. They did so at their peril.

"Content is undoubtedly the most important factor in assessing whether particular speech touches on a matter of public concern." *Mitchell v. Hillsborough County*, 468 F.3d 1276, 1284 (11th Cir. 2006). However, "when context and motivation are considered, even speech that, content-wise, lies near the core of the First Amendment's protection – archetypical public speech – may be deemed private speech." *Id*. Thus, even when, as here, defendants start out in a rather deep hole, context and motivation might in a proper case dig them out.

## 2. Context.

The plaintiff made his statements to the mayor and to two city council members, individually. While, as the defendants note, (Doc. 35 at 18), the plaintiff did not go the media or address the city council in open session, "[n]either the [First] Amendment itself nor our decisions indicate that this freedom [of speech] is lost to the public employee who arranges to communicate privately with his employer rather than to spread his views before the public. We decline to adopt such a view of the First Amendment." *Givhan v. Western Line Consolidated School District*, 439 U.S. 410, 415-16 (1979). "Many citizens do much of their talking inside their respective workplaces, and it would not serve the goal of treating public employees like any member of the general public … to hold that all speech within the office is automatically exposed to restriction." *Garcetti*,

---

[6] Speech that relates to a matter of political or social concern is speech addressing a matter of public concern. *Fikes*, 79 F.3d at 1084.

547 U.S. at 421 (citations and internal quotes omitted). "We have … held that speech relates to a matter of public concern in numerous instances where the speech was relayed only to decisionmakers and not to the general public." *Rodin v. City of Coral Springs*, 229 Fed. Appx. 849, 856 (11th Cir. 2007) (citing, inter alia, *Fikes*, where the plaintiff reported police misconduct only to the Alabama Bureau of Investigation). Thus, "the fact that [the plaintiff city employee's] expression was directed to [the mayor] privately does not render his speech outside the purview of the first amendment." *Berdin v. Duggan*, 701 F.2d 909, 912 (11th Cir. 1983). As the defendants acknowledge, the plaintiff's reporting to the mayor and city council members privately "is not a decisive factor." (Doc. 35 at 18).

### 3. Motivation.

"[A]n employee's motive for speech, while not dispositive, is a factor that must be considered in determining whether speech is a matter of public concern." *Mitchell*, 468 F.3d at 1283-84 (internal quotes omitted). Thus, for example, a "clear personal animus motivating [speech] may have been sufficient to render that speech essentially private …." *Id*. at 1284.

The defendants have presented evidence that Hudson transferred the plaintiff from investigations to patrol after a local judge notified Hudson he had been forced to dismiss 44 warrants due to errors by the plaintiff. (Hudson Affidavit, ¶ 4; Doc. 35 at 14). From this, the defendants surmise that the plaintiff's motivation in speaking about Hudson was anger over this transfer and a desire to have Hudson removed as chief. (*Id*. at 16-18).

Such a motivation is theoretically possible but unlikely for a number of reasons. First, the defendants admit that the move from investigations to patrol was "no demotion" but a "simple transfer." Second, they admit that "[t]here was no change in rank" and "no decrease in pay or benefits." Third, they admit this innocuous transfer "occurred much more than two years before [the plaintiff] was

terminated."  Fourth, they admit the plaintiff knew the change was initiated because the judge had told Hudson the plaintiff did not need to be in the investigations department.  (Hudson Affidavit, ¶ 7).  Fifth, they can point to no other evidence (for example, statements by the plaintiff) to support their theory.

"In the cases where we have found no matter of public concern, we have concluded that the motivation behind the employee's speech was *purely* private." *Rodin*, 229 Fed. Appx. at 855 (emphasis added).  The defendants' speculation cannot establish that the plaintiff reported Hudson's conduct simply to retaliate for an ancient, neutral employment decision.  At least in part if not in full, "in alleging police misconduct, [the plaintiff] sought to bring to light actual or potential wrongdoing or breach of public trust on the part of government officials."  *Fikes*, 79 F.3d at 1084.

### 4.  Summary.

The content of the plaintiff's speech addressed core public concerns.  There is no evidence that the plaintiff's motivation in speaking was purely or even partially personal revenge, and the mere fact that he addressed City officials privately rather than publicly accusing Hudson and Hamilton of official misconduct does not withdraw his speech from First Amendment protection.

### B.  Balancing of Interests.

As with the question of public concern, whether a plaintiff's interest in speaking outweighs the employer's interest in prohibiting the speech is a question of law for the Court to decide.  *Vila*, 484 F.3d at 1339.  Again, however, the Court must perform its function based on the evidence and argument presented and in accordance with Rule 56.

The balancing required by First Amendment analysis in the public employee context compares "the employee's First Amendment interest in engaging in the speech" with "the employer's interest in prohibiting the speech."

*Battle*, 468 F.3d at 760.  Factors include "the manner, time, and place of the employee's expression and the context in which the dispute arose."  *Leslie v. Hancock County Board of Education*, 720 F.3d 1338, 1346 (11th Cir. 2013) (internal quotes omitted).  In addition, "[t]he [Supreme] Court has also recognized as pertinent considerations whether the statement impairs discipline by superiors or harmony among co-workers, has a detrimental impact on close working relationships for which personal loyalty and confidence are necessary, or impedes the performance of the speaker's duties or interferes with the regular operation of the enterprise."  *Id*. ( internal quotes omitted).  The analysis is known as "the *Pickering* balance."  *E.g., Leslie*, 720 F.3d at 1346.

   In the single paragraph they devote to the balancing issue, the defendants place the wrong item in the scales.  Rather than comparing the plaintiff's interest in his speech with his employer's interest in prohibiting that speech, the defendants compare the plaintiff's interest in his speech with the employer's interest in terminating the plaintiff for lack of honesty and integrity in connection with the television incident.  (Doc. 35 at 19).  "This argument is without merit as [the defendants] confus[e] this, the second prong, with the third and fourth prongs of" the analysis.  *Stanley v. City of Dalton*, 219 F.3d 1280, 1289 n.15 (11th Cir. 2000).

   The closest the defendants come to addressing the balancing test is their unamplified complaint that the plaintiff's statements about Hudson and Hamilton "lack … credibility."  (Doc. 35 at 19; *accord* Doc. 45 at 9).  Despite the defendants' failure to support or explain their position, the Court will consider it.

   In *Stanley*, the plaintiff police officer told the Georgia Bureau of Investigation ("GBI") that he suspected the deputy police chief of stealing money from the evidence room.  His only support for this theory was that the chief was one of two people with keys to the evidence room and that it appeared to be an inside job.  219 F.3d at 1282.  In weighing the parties' competing interests, the Eleventh Circuit first recognized "the admittedly strong interests of [a deputy

police chief] and the police department in maintaining close working relationships, mutual respect, discipline, and trust in the quasi-military setting of the police department." *Id*. at 1289. Moreover, "[t]he police department has a strong interest in preventing disruptive speech, such as unfounded accusations against superiors." *Id*. at 1290. However, although the plaintiff expressed only a theory rather than concrete statements of fact about what he had seen, heard or knew, he "had some factual basis, albeit slight, for telling the GBI that he suspected" the deputy chief. *Id*. Given that slight factual basis, the plaintiff's failure to broadcast his theory past the GBI, the absence of any evidence his statement had disrupted the police department's operations, and the defendants' failure to show that the plaintiff "intentionally and falsely accused" the deputy chief of theft, the Eleventh Circuit "conclude[d] that the *Pickering* balance tilts in [the plaintiff's] favor." *Id*. at 1290-91.

Just so here. The defendants have not asserted the plaintiff has no factual basis for his statements, many of which address events he witnessed.[7] By "lack of credibility," the defendants apparently mean only that Hudson and Hamilton deny some (though not all) of the plaintiff's accusations. (Doc. 35 at 4-6). But those denials merely set up a factual dispute; they do not on their own establish the defendants' version as accurate. And the defendants fail even to deny much of what the plaintiff reported.[8]

---

[7] The plaintiff has offered testimony that he was present: when Hudson told a shooting suspect that he and the person who supplied him the weapon should leave town; when Hudson and Hamilton took marijuana from a citizen and let him go; when Hudson shoved a citizen against a wall, bumping her head; on three occasions when Hudson struck a citizen with his flashlight; and on one occasion when Hudson pepper sprayed a high school coed. (Plaintiff Deposition at 60-61, 69, 77-78, 127-30, 150-51, 154, 167).

[8] The affidavits on which the defendants rely, (Doc. 35 at 4-6), do not address at least the following: Hudson's telling a shooting suspect that he and the person who supplied him the weapon should leave town; the failure of Hudson and Hamilton to account for contraband taken from a suspect; and several instances of Hudson's use of allegedly excessive force. (Hudson Affidavit, ¶¶ 13-14, 16-18; Hamilton Affidavit, ¶ 3).

The plaintiff did not broadcast his concerns but confined his statements to three individuals holding positions of official authority over Hudson and Hamilton. There is no evidence the plaintiff's statements disrupted police operations or that the plaintiff deliberately lied. On this state of affairs the Court must conclude that, as in *Stanley*, the balancing of interests favors the plaintiff.

### C. Substantial Part.

Hudson recommended that the plaintiff be terminated. When the plaintiff requested a pre-disciplinary hearing, a grievance committee convened, heard evidence, and unanimously recommended to the city council that the plaintiff be terminated. The city council, without dissent, voted to accept the committee's recommendation, and the plaintiff was terminated. (Hudson Affidavit, ¶ 6; Cook Affidavit, Exhibits 1-6).

The plaintiff does not accuse either the grievance committee or the city council of acting from a retaliatory motive.[9] Instead, the plaintiff argues only that Hudson's recommendation and testimony were infected with retaliatory animus. (Doc. 42 at 15). According to the defendants, Hudson made his recommendation based on evidence of misconduct and dishonesty in connection with the television incident. (Hudson Affidavit, ¶ 8).

The defendants offer three reasons why the plaintiff cannot establish that his speech played a substantial part in the decision to terminate him: (1) the plaintiff has no evidence that Hudson was aware the plaintiff had made statements about him or Hamilton; (2) the plaintiff has no evidence that Hudson harbored a retaliatory motive; and (3) even if Hudson had such a motive, others who lacked a retaliatory motive made the decision to terminate. (Doc. 35 at 19-21).

---

[9] While he believes the committee was "biased," (Plaintiff Deposition at 272-73), the plaintiff does not assert this bias was based on a retaliatory motive; indeed, he does not assert the committee members had any inkling he had engaged in protected speech. The bias he suspects is bias in favor of Hudson as police chief. (*Id*. at 245-46).

### 1. Hudson's awareness of the plaintiff's protected speech.

The parties, and the Court, assume that Hudson could not have recommended termination in retaliation for the plaintiff's protected speech unless he was aware that the plaintiff had engaged in such speech.[10]  Hudson denies knowing the plaintiff was making complaints to the mayor and city council members.  (Hudson Affidavit, ¶ 7).  The plaintiff has presented evidence, however, that Hudson told the officers, when he became police chief, that every time an officer speaks to a council member, he (Hudson) knows about it.  (Plaintiff Deposition at 96-97).  Later, about six months before the plaintiff was terminated, Hudson again said, "[Y]ou guys got to stop talking with the councilmen because every time you say something to them, I know what you said."  (*Id*. at 177-78).  The defendants do not address this evidence in their reply brief, and it plainly creates an issue of fact as to whether Hudson was aware of the plaintiff's complaints about him.

### 2. Hudson's retaliatory animus.

"[W]e examine the record as a whole to ascertain whether [the plaintiff] presented sufficient evidence for a reasonable jury to conclude that his protected speech was a 'substantial' motivating factor in the decision to terminate him."  *Stanley*, 219 F.3d at 1291.  "There is no one factor that is outcome determinative, but all factors must be taken into account."  *Id*. at 1291 n.20.  These factors include: whether "termination closely follows protected activity"; "whether any other asserted reasons for the termination were shown to be pretextual"; "any comments made, or actions taken, by the employer indicating that the discharge was related to the protected speech"; "whether the asserted reason for the discharge varied"; and other "circumstantial evidence of causation including such

---

[10] *Cf. Gupta v. Florida Board of Regents*, 212 F.3d 571, 590 (11th Cir. 2000) (Title VII case) ("To establish a causal connection, a plaintiff must show that the decisionmakers were aware of the protected conduct ….").

facts as who initiated any internal investigations or termination proceedings, whether there was any evidence of management hostility to the speech in question, or whether the employer had a motive to retaliate." *Id*. (internal quotes omitted).

The plaintiff relies primarily on the first of these factors to create a jury issue as to Hudson's retaliatory animus, yet he fails to set forth any evidence of temporal proximity. (Doc. 42 at 14). From deposition excerpts cited by the defendants, the Court can determine that the plaintiff has no evidence of any conversation with the mayor or either of the two council members less than "a couple of months" before he was notified of Hudson's recommendation. (Plaintiff Deposition at 54-56). This is too long a gap to furnish significant evidence of a retaliatory animus.[11] Moreover, during his employment the plaintiff talked to the mayor about all sorts of things (such as carpentry) not subject to First Amendment protection, (*id*. at 75), and he has no evidence that the conversations closest in time to Hudson's recommendation involved protected speech.

The plaintiff next complains that Hudson "blew the television incident out of proportion." (Doc. 42 at 15). Notably, he does not assert that Hudson fabricated the incident or the evidence surrounding it, and he would be hard-pressed to support such an assertion. It is uncontroverted that the complainant approached Hamilton and accused the plaintiff of taking her television against her will and refusing to return it. (Hamilton Affidavit, ¶ 5). It is uncontroverted that Hudson's investigation of this complaint included at least the following: (1) questioning the complainant; (2) questioning the plaintiff; (3) questioning the officer accompanying the plaintiff; (4) obtaining rental documents; (5) inspecting the apartment rented in the plaintiff's name; and (6) questioning the officer whom the plaintiff said was living there. (Hudson Affidavit, ¶ 5; Smith Affidavit, ¶¶ 5-6). It is uncontroverted that the investigation revealed at least the following: (1) that the complainant informed the plaintiff the television was hers; (2) that the

---

[11] *Cf. Thomas v. Cooper Lighting, Inc*., 506 F.3d 1361, 1364 (11th Cir. 2007) (Title VII case) (three months is too long to support an inference of causation).

plaintiff nonetheless instructed that the television be taken to the other apartment; (3) that the apartment into which the television was moved was rented in the plaintiff's name; (4) that the plaintiff was receiving the apartment rent-free in exchange for providing security; (5) that the complainant tried repeatedly over an extended period to get the plaintiff to return the television, without success; (6) that the television was still in the apartment several months later, plugged in; and (7) that the apartment was not occupied by the female officer identified by the plaintiff. (Hudson Affidavit, ¶ 5 & Exhibit 1; Smith Affidavit, ¶¶ 3-6, 9; Hamilton Affidavit, ¶¶ 5-6). And it is uncontroverted that the investigation revealed evidence of at least the following instances of dishonesty by the plaintiff: (1) denying that the complainant had told him the television was hers (even though the complainant and the assisting officer confirmed she had done so); and (2) asserting that another officer lived in the apartment (even though that officer denied it). (Hudson Affidavit, ¶ 5).

Given that evidence, on what basis does the plaintiff assert that Hudson blew the incident out of proportion? The plaintiff wisely does not suggest that lying to his superior is appropriate conduct, he admits it would violate policy for him to remove the television after the complainant stated it was hers, (Plaintiff Deposition at 200-01, 209), and if it was wrong to remove the television it was equally wrong not to return it upon request for an extended period and even more wrong to keep the television, in use, in his own apartment.[12]

The plaintiff has his own, exculpatory version of events. He denies that the complainant identified the television as hers, and he says he made efforts to return the television to her. He concedes the apartment was rented in his name, but he says another officer was actually living there. But his version, especially in the face of contradictory statements from every other witness, (Hudson Affidavit, ¶ 5),

---

[12] The defendants hint that the plaintiff's acceptance of a rent-free apartment was problematic, but they have neither said so expressly nor offered support for such a proposition. The Court therefore does not consider it.

could scarcely render it unreasonable for Hudson to pursue corrective action. *Cf. Alvarez v. Royal Atlantic Developers, Inc.*, 610 F.3d 1253, 1266 (11th Cir. 2010) (Title VII case) ("[The] inquiry is limited to whether [the] employer *believed* [the] employee was guilty of misconduct and if so, whether that was [the] reason behind [his] discharge; that [the] employee did not actually engage in misconduct is irrelevant.") (emphasis in original). The evidence of the plaintiff's misconduct is not so flimsy as to suggest Hudson did not truly believe it had occurred. It is worth noting that the three grievance committee members, who are not alleged to have harbored a retaliatory motive, heard the plaintiff and the complainant testify and believed the complainant rather than the plaintiff. (Doc. 34, Exhibits E-G).

It appears the plaintiff argues that Hudson blew the television incident out of proportion, not by pursuing corrective action but by recommending termination rather than reprimand or suspension. (Doc. 42 at 16). But the plaintiff acknowledges that termination was an available option given his infractions, (*id.* & Ex. B), and nothing required Hudson to eschew that option, even if the plaintiff believes a lesser sanction would have sufficed. "[A] plaintiff may not establish that an employer's proffered reason is pretextual merely by questioning the wisdom of the employer's reason, at least not where, as here, the reason is one that might motivate a reasonable employer." *Combs v. Plantation Patterns*, 106 F.3d 1519, 1543 (11th Cir. 1997) (Title VII case). Certainly the conduct at issue here might motivate a reasonable employer to terminate the offender, as is made manifestly clear by the agreement of seven admittedly non-retaliatory individuals (the three committee members plus the four voting members of the city council) that termination was an appropriate sanction.

The plaintiff's only other effort to show Hudson's retaliatory motive involves the timing of his termination recommendation. According to the affidavit of the city clerk, the plaintiff was issued a notice of intent to terminate employment on June 12, 2012. (Cook Affidavit, ¶ 7). Yet the clerk also states that Hudson did not learn of the television incident until June 14, 2012. (*Id.*, ¶ 4).

The plaintiff concludes that Hudson recommended termination before even knowing of the television incident he says was the basis of his recommendation, thereby suggesting his real basis must be retaliation. (Doc. 42 at 6-7 & 6 n.1).

The defendants respond that the date of June 14 is a "scrivener's error" and that the correct date is June 4, and they request permission to file a supplemental affidavit correcting the error. (Doc. 44 & Exhibit J). The Court has denied that motion, *see* n.1, *supra*, because the supplemental affidavit cannot erase the original affidavit with its June 14 date. Even without a supplemental affidavit, however, the June 14 date is unhelpful to the plaintiff, because the June 12 notice of intent expressly references Hudson's investigation of the television incident, (Cook Affidavit, Exhibit 1), making it obvious that Hudson did in fact know of the incident when he recommended termination. A conflict in the evidence there may be, but no conflict that a properly functioning jury could resolve in favor of the plaintiff.

In summary, the plaintiff has not identified sufficient evidence for a reasonable jury to conclude that his protected speech was a substantial motivating factor in Hudson's recommendation that he be terminated or in his testimony at the plaintiff's pre-disciplinary hearing. Without such evidence, his First Amendment claim necessarily fails as to all defendants.

### 3. Hudson's relationship to the termination decision.

The defendants stress that it was the city council, not Hudson, that terminated the plaintiff, and that the termination decision was based on the recommendation of the grievance committee, which heard evidence and reached its own decision. (Doc. 35 at 20-21). The plaintiff responds that the necessary causal connection between Hudson's recommendation and the city council's decision can be drawn under either the Eleventh Circuit's familiar "cat's paw" theory or the Supreme Court's more recent "proximate cause" variant. (Doc. 42 at

14-15).  In reply, the defendants address the former theory but not the latter.  (Doc. 45 at 10-11).

In the Title VII context, "[o]ne way of proving that the discriminatory animus behind the recommendation caused the discharge is under the 'cat's paw' theory.  This theory provides that causation may be established if the plaintiff shows that the decisionmaker followed the biased recommendation without independently investigating the complaint against the employee."  *Stimpson v. City of Tuscaloosa*, 186 F.3d 1328, 1332 (11th Cir. 1999); *accord Crawford v. Carroll*, 529 F.3d 961, 979 n.21 (11th Cir. 2008).  Because the grievance committee conducted an independent investigation by taking testimony from the plaintiff, the complainant and Hudson and making its own determinations of credibility and culpability rather than simply relying on Hudson's recommendation, under traditional cat's paw theory the plaintiff could not establish causation even had he presented evidence that Hudson acted with a retaliatory motive.

However, in *Staub v. Proctor Hospital*, 131 S. Ct. 1186 (2011), the Supreme Court rejected in some contexts the Seventh Circuit's version of cat's paw theory, which precludes liability based on a biased recommendation if "the decisionmaker is not wholly dependent on a single source of information and conducts her own investigation into the facts relevant to the decision."  *Id*. at 1190 (internal quotes omitted).

*Staub* arose under the Uniformed Services Employment and Reemployment Rights Act ("USERRA"), which protects service members against adverse actions as to which their status "is a motivating factor."  131 S. Ct. at 1190-91 (quoting 38 U.S.C. § 4311(c)).  The Court noted that "when Congress creates a federal tort it adopts the background of general tort law."  *Id*. at 1191.  Applying that body of law, the Court "h[e]ld that if a supervisor performs an act motivated by antimilitary animus that is intended by the supervisor to cause an adverse employment action, and if that act is a proximate cause of the ultimate employment action, then the employer is liable under USERRA."  *Id*. at 1194.

"So long as the agent intends, for discriminatory reasons, that the adverse action occur, he has the scienter required to be liable under USERRA," and his act can be considered a proximate cause of the adverse action. *Id*. at 1192. The unbiased decisionmaker's exercise of judgment does not sever this proximate cause but merely adds the decisionmaker's involvement as another proximate cause. *Id*.

Nor, under *Staub*, does the unbiased decisionmaker's independent investigation necessarily preclude the supervisor's biased input from being a proximate cause of the adverse employment action. "[T]he supervisor's biased report may remain a causal factor if the independent investigation takes it into account without determining that the adverse action was, apart from the supervisor's recommendation, entirely justified." 131 S. Ct. at 1193.

While *Staub* involved USERRA, the Supreme Court noted that Title VII also utilizes a "motivating factor" standard of causation. 131 S. Ct. at 1191. The Eleventh Circuit has employed the *Staub* standard in the Title VII context. *King v. Volunteers of America, Inc*., 502 Fed. Appx. 823, 828 (11th Cir. 2012). But it has declined to extend *Staub* to the ADEA context, because that statute requires "but-for" causation. *Sims v. MVM, Inc*., 704 F.3d 1327, 1335-36 (11th Cir. 2013).

In the First Amendment context, the Eleventh Circuit equates "substantial part" with "motivating factor." *E.g., Carter v. City of Melbourne*, 731 F.3d 1161, 1168 (11th Cir. 2013); *Walden v. Centers for Disease Control and Prevention*, 669 F.3d 1277, 1286 (11th Cir. 2012). This terminology traces back to the seminal First Amendment retaliation case of *Mt. Healthy City School District Board of Education v. Doyle*, 429 U.S. 274 (1977), in which the Supreme Court expressly equated "substantial factor" with "motivating factor." *Id*. at 287.

The defendants do not deny that cat's paw theory applies in the First Amendment context but assert only that the plaintiff cannot satisfy it because the grievance committee performed an independent investigation. (Doc. 45 at 10-11). The Court therefore assumes that the Eleventh Circuit does or would permit this theory to be raised in the First Amendment context. Because First Amendment

jurisprudence implicates only a "motivating factor" standard of causation, the Court further assumes that the *Staub* variant of cat's paw theory applies in the First Amendment context.

Without acknowledging *Staub*, the defendants assert that "[n]ot one Grievance Committee member states any reliance on the alleged testimony of Chief Hudson." (Doc. 45 at 4). Quite so, but they have neither denied having taken Hudson's testimony or recommendation into account nor stated that termination was entirely justified apart from his testimony and recommendation.[13] Absent such evidence, the defendants have failed to show the plaintiff's inability to establish that Hudson played a substantial part in the termination decision under the *Staub* variant of cat's paw theory.

### D. Same Decision.

The question is whether the plaintiff would have been terminated had he not engaged in protected speech by complaining about Hudson and Hamilton. *Battle*, 468 F.3d at 760. The defendants do not address this question. Instead, they address whether the plaintiff would have been terminated had he not actually been guilty of misconduct in connection with the television incident. (Doc. 35 at 22; Doc. 45 at 11).

Even had the defendants properly addressed the issue, they could not obtain summary judgment on this ground. As discussed in Part I.C.3, the defendants have failed to show that the grievance committee either did not consider Hudson's testimony or that they would have reached the same decision without his testimony.

---

[13] On the contrary, each committee member testified that he or she "based my decision to vote to recommend termination on the evidence during the hearing." (Doc. 34, Exhibits E-G). That evidence, of course, included Hudson's testimony.

## E. Defendants' Liability.

Because, as discussed in Part I.C.2, the plaintiff cannot create a jury issue as to whether Hudson acted with a retaliatory motive, all defendants are entitled to summary judgment on his First Amendment claim. Even had the plaintiff created such a jury issue, his claim would fail almost entirely for reasons that appear below.

### 1. Hamilton.

The plaintiff believes that Hamilton acted as Hudson's "accomplice" by coaxing the complainant to file charges against the plaintiff and by generally agreeing with whatever Hudson does. (Plaintiff Deposition at 243). Hamilton, however, has presented uncontroverted evidence that he did not encourage the complainant to come forward. (Hamilton Affidavit, ¶¶ 5-7). Nor has the plaintiff identified any authority for the proposition that "agreeing" with an alleged retaliator makes one liable for the other's retaliation. Without evidence or argument that he harbored a retaliatory motive, that he played any role in the decision to terminate the plaintiff, or that he is legally responsible for any role played by Hudson, the plaintiff cannot possibly maintain a First Amendment claim against Hamilton. The defendants pointed this out, (Doc. 35 at 20), and the plaintiff responded with silence.

### 2. The City.

### a. Custom or policy.

The plaintiff brings his constitutional claims, as he must, through the vehicle of Section 1983. (Doc. 19 at 4-6). "A municipality may not be held liable under section 1983 on a theory of respondeat superior." *Snow ex rel. Snow v. City of Citronelle*, 420 F.3d 1262, 1270 (11th Cir. 2005). "Instead, to impose section 1983 liability on a municipality, a plaintiff must show: (1) that his constitutional rights were violated; (2) that the municipality has a custom or policy that

constituted deliberate indifference to that constitutional right; and (3) that the policy or custom caused the violation." *McDowell v. Brown*, 392 F.3d 1283, 1289 (11th Cir. 2004). "A policy is a decision that is officially adopted by the municipality, or created by an official of such rank that he or she could be said to be acting on behalf of the municipality …. A custom is a practice that is so settled and permanent that it takes on the force of law." *GeorgiaCarry.Org, Inc. v. Georgia*, 687 F.3d 1244, 1254 n.17 (11th Cir. 2012) (internal quotes omitted).

The defendants first suggest the amended complaint is defective for failure to allege facts supporting the existence of a relevant custom or policy. (Doc. 35 at 9). This argument fails for reasons set forth in Part II.

The defendants also assert the plaintiff has no evidence with which to establish a custom or policy of retaliation for the exercise of First Amendment rights. (Doc. 35 at 10-11). The plaintiff responds that "municipal liability may be imposed for a single decision by municipal policymakers," and he insists that Hudson constitutes such a policymaker. (Doc. 42 at 17). It is true that "[m]unicipal liability may arise with regards to an employment decision, such as termination …." *Quinn v. Monroe County*, 330 F.3d 1320, 1325 (11th Cir. 2003). However, "[m]unicipal liability attaches only where the decisionmaker possesses final authority to establish municipal policy with respect to the action ordered." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 481 (1986); *accord Doe v. School Board of Broward County*, 604 F.3d 1248, 1264 (11th Cir. 2010). The plaintiff says Hudson had "final authority" to terminate him, (Doc. 42 at 17), but he plainly did not.

"[F]inal policymaking authority over a particular subject matter does not vest in an official whose decisions are subject to meaningful administrative review." *Doe*, 604 F.3d at 1264 (internal quotes omitted). When a superior "has the authority to veto [a] recommendation, this decision [of the subordinate] [i]s subject to meaningful administrative review …, and [the subordinate] [i]s not a final policymaker that can subject the [entity] to § 1983 municipal liability." *Id.* at

1265.  While Hudson could (and did) recommend termination, the plaintiff was not terminated until the city council voted to accept the grievance committee's recommendation.  Moreover, the grievance committee subjected Hudson's recommendation to meaningful administrative review by holding a hearing and receiving testimony from the plaintiff, the complainant and Hudson.  As a matter of law, Hudson is not a "final policymaker" whose recommendation of termination, even if the product of retaliatory bias, could support municipal liability.

### b.  Cat's paw.

The plaintiff also argues that municipal liability attaches under a cat's paw theory.  (Doc. 42 at 17-18).  As discussed in Part I.C.3, he does not fare well under a traditional cat's paw paradigm but, if the *Staub* variant applies in the First Amendment context, the plaintiff might successfully utilize it to establish a causal connection between Hudson's recommendation and the plaintiff's termination.  Whatever the applicability of cat's paw theory in determining causation, however, the Court concludes that it has no place in determining the separate question of municipal liability.[14]

The Seventh Circuit has expressed skepticism about the plaintiff's position, noting that "[i]mputing a nondecisionmaker's motive to a municipal employer sounds a lot like respondeat superior liability," which cannot form the basis of municipal liability.  *Waters v. City of Chicago*, 580 F.3d 575, 586 n.2 (7th Cir. 2009).  And the Sixth Circuit has declared that "Plaintiff's argument that Schuck exercises final authority, because the Board allegedly 'rubber-stamps' his recommendations is contrary" to Supreme Court precedent.  *Hull v. Cuyahoga*

---

[14] As *Staub* holds, the successful invocation of cat's paw theory would effectively establish the liability of a private employer, based on concepts of agency and proximate cause.  131 S. Ct. at 1192, 1194.  However, as discussed in text, the liability of a municipal employer requires additional findings.

*Valley Joint Vocational School District Board of Education*, 926 F.2d 505, 515 (6ᵗʰ Cir. 1991).[15]

The Court agrees with these opinions. The Supreme Court and the Eleventh Circuit have already established the parameters of municipal liability, the salient features of which have been described above. A cat's paw theory that permitted a city to be liable for the retaliatory recommendation or testimony of a subordinate who lacked final authority to make the employment decision and whose recommendation was subject to veto and meaningful administrative review, simply because the city relied in part (or even entirely) on the recommendation or testimony of that subordinate in reaching its decision, would flatly contradict the established standard. Even if it believed such an approach to be appropriate or desirable, the Court is without authority to abandon controlling precedent in favor of a cat's paw theory.

The *Waters* Court noted the complete lack of judicial authority for "awkwardly fit[ting] the cat's paw concept in this area of civil rights." 580 F.3d at 586 n.2. This Court will not be the first to approve the device as a basis for municipal liability.

### 3. Hudson.

---

[15] *See also Perzynski v. Cerro Gordo County*, 953 F. Supp. 2d 916, 930 & n.4 (N.D. Iowa 2013) (use of cat's paw theory to establish a county's liability is not "legally viable"), *aff'd*, 2014 WL 904193 (8ᵗʰ Cir. 2014); *Jackson v. City of Centreville*, 899 F. Supp. 2d 1209, 1222 (N.D. Ala. 2012) (because municipal liability cannot be based on respondeat superior or vicarious liability, "the cat's paw theory does not apply in the § 1983 context.") (internal quotes omitted); *Files v. DeKalb County School District*, 2012 WL 716055 at *4 (N.D. Ga. 2012) (same); *Manuele v. City of Jennings*, 2012 WL 113538 at *10 (E.D. Mo. 2012) ("The Court agrees that cat's paw liability does not apply to municipalities, which cannot be held liable on agency principles."); *Nichols v. Schilling*, 2011 WL 1630981 at *11 n.30 (E.D. Wis. 2011) ("[T]he court is constrained by the case law to similarly find that the cat's paw theory is not a viable means to find a municipality liable for its employee's conduct."); *Sebastian v. City of Chicago*, 2008 WL 2875255 at *38 (N.D. Ill. 2008) (prior to *Waters*, rejecting municipal liability based on cat's paw analysis).

### a. Causation.

The defendants begin by insisting that, because Hudson only recommended the plaintiff's termination, he cannot have caused the termination so as to be exposed to personal liability. (Doc. 35 at 13; Doc. 45 at 13-14). They offer no analysis or legal authority in support, which omission is sufficient on its own to require rejection of their position. However, the Court notes that, as discussed in Part I.C.3, the defendants have failed to show the plaintiff's inability under *Staub* to establish that Hudson's recommendation and/or testimony was a proximate cause of the plaintiff's termination.[16]

### b. Qualified immunity.

Hudson's primary focus is on qualified immunity. (Doc. 35 at 11-13). "[G]overnment officials performing discretionary functions generally are shielded

---

[16] The Court is aware of the Eleventh Circuit's suggestion that: (1) only an "official decisionmaker" can be individually liable under Section 1983; (2) that only one with the power to terminate (not merely to recommend termination) can be an official decisionmaker; and (3) that there can be no individual liability even if the official decisionmaker merely "rubber stamps" the individual's retaliatory recommendation of termination. *See Kamensky v. Dean*, 148 Fed. Appx. 878, 879-80 (11th Cir. 2005).

"Unpublished opinions [such as *Kamensky*] are not controlling authority and are persuasive only insofar as their legal analysis warrants." *Bonilla v. Baker Concrete Construction, Inc.*, 487 F.3d 1340, 1345 n.7 (11th Cir. 2007). *Kamensky* relied on *Quinn* for its first two propositions but, with respect to the third, stated only that the Eleventh Circuit "ha[s] not extended this [cat's paw] line of cases to individual liability, and [we] refrain from doing so here." 148 Fed. Appx. at 880. This is not a rejection of the principle and certainly not a reasoned rejection. Nor is it clear that *Kamensky*'s result could survive *Staub*, which teaches that, in a "motivating factor" scheme, a biased employee's input proximately causes the adverse action unless the decisionmaker seals off the biased input from affecting its decision. Because, unlike with municipal liability, there are no additional requirements beyond causation for individual liability under Section 1983, the employee's retaliatory input in such a situation should suffice to establish his individual liability. Finally, "[t]here is also precedent from five other circuits for imposing individual liability on the unlawfully motivated subordinate (the monkey, in the cat's paw fable) under § 1983." *Smith v. Bray*, 681 F.3d 888, 899 (7th Cir. 2012). The Court thus does not find *Kamensky* persuasive and declines to follow it, especially as the defendants have not invoked it.

from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).

"[T]he burden is first on the defendant to establish that the allegedly unconstitutional conduct occurred while he was acting within the scope of his discretionary authority." *Harbert International, Inc. v. James*, 157 F.3d 1271, 1281 (11th Cir. 1998). The burden then shifts to the plaintiff to show that the defendant's conduct "violated a clearly established statutory or constitutional right." *Grayden v. Rhodes*, 345 F.3d 1225, 1231 (11th Cir. 2003).

### (i) Discretionary authority.

"[T]he burden is first on the defendant to establish that the allegedly unconstitutional conduct occurred while he was acting within the scope of his discretionary authority. ... If, and only if, the defendant does that will the burden shift to the plaintiff to establish that the defendant violated clearly established law." *Harbert International*, 157 F.3d at 1281 (emphasis added). The reason is that an official acting outside the scope of his discretionary authority "ceases to act as a government official and instead acts on his own behalf," so that "the policies underlying the doctrine of qualified immunity no longer support its application." *Id*.

For purposes of federal qualified immunity analysis, a defendant acts within his discretionary authority when "his actions were undertaken pursuant to the performance of his duties and within the scope of his authority." *Rich v. Dollar*, 841 F.2d 1558, 1564 (11th Cir. 1988) (internal quotes omitted). For this inquiry, "[w]e ask whether the government employee was (a) performing a legitimate job-related function (that is, pursuing a job-related goal), (b) through means that were within his power to utilize." *Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1265 (11th Cir. 2004).

The first prong of this test requires that the defendant "have been performing a function that, but for the alleged unconstitutional infirmity, would have fallen within his legitimate job description." *Holloman*, 370 F.3d at 1266 (emphasis omitted). "The inquiry is not whether it was within the defendant's authority to commit the allegedly illegal act," but "whether the act complained of, if done for a proper purpose, would be within, or reasonably related to, the outer perimeter of an official's discretionary duties." *Harbert International*, 157 F.3d at 1282 (internal quotes omitted).[17]

As for the second prong, "[e]ach government employee is given only a certain 'arsenal' of powers with which to accomplish her goals." *Holloman*, 370 F.3d at 1267. "Pursuing a job-related goal through means that fall outside the range of discretion that comes with an employee's job is not protected by qualified immunity." *Id*.

Investigating police misconduct and recommending termination of police officers fall within an Alabama police chief's discretionary authority. *See Grider v. City of Auburn*, 618 F.3d 1240, 1267-68 (11th Cir. 2010); *Barnette v. Folmar*, 64 F.3d 598, 600 (11th Cir. 1995); *Hardy v. City of Hayneville*, 50 F. Supp. 2d 1176, 1189 (M.D. Ala. 1999). When a plaintiff does not dispute that the defendant was acting within his discretionary authority, the Eleventh Circuit proceeds directly to whether the defendant's conduct violated the plaintiff's clearly established right. *E.g., Franklin v. Curry*, 738 F.3d 1246, 1249 (11th Cir. 2013); *Gilmore v. Hodges*, 738 F.3d 266, 272 (11th Cir. 2013). As the plaintiff does not dispute that Hudson acted within his discretionary authority, (Doc. 42 at 18-22), the Court proceeds to the next question.

### (ii) Clearly established constitutional right.

---

[17] For example, the issue is not whether a marshal has the authority to deliver a prisoner into unconstitutional conditions but whether he has the authority to transport and deliver prisoners. *Harbert International*, 157 F.3d at 1282 (describing *Jordan v. Doe*, 38 F.3d 1559, 1566 (11th Cir. 1994)).

Because Hudson has carried his threshold burden, the burden shifts to the plaintiff to show that Hudson's conduct "violated a clearly established statutory or constitutional right." *Grayden*, 345 F.3d at 1231. The inquiry may be broken down into two parts: (1) whether the facts alleged, if true, would establish a violation of the plaintiff's rights; and (2) whether those rights were clearly established at the time of the alleged deprivation. *Id.* As discussed in Part I.C.2, the plaintiff cannot establish a constitutional violation. The Court proceeds in order to demonstrate that, even could the plaintiff establish a constitutional violation, Hudson would be entitled to qualified immunity.

To be clearly established, "pre-existing law must dictate, that is truly compel (not just suggest or allow or raise a question about), the conclusion for every like situated reasonable government agent that what the defendant is doing violates federal law in the circumstances." *Lassiter v. Alabama A&M University*, 28 F.3d 1146, 1150 (11th Cir. 1994) (en banc). "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier v. Katz*, 533 U.S. 194, 202 (2001). In making this inquiry, "the salient question … is whether the state of the law … gave the [defendants] fair warning that their alleged [conduct] was unconstitutional." *Hope v. Pelzer*, 536 U.S. 730, 741 (2002).

The plaintiff's only argument against qualified immunity is the unhelpful observation that "it is clearly established that a public employer may not retaliate against an employee for an employee's exercise of constitutionally protected speech." (Doc. 42 at 22). That formulation overlooks the foundational question of whether it was clearly established in June 2012 that the speech in which the plaintiff engaged was constitutionally protected. *E.g., Hansen v. Soldenwagner*, 19 F.3d 573, 575 (11th Cir. 1994). That of course depends on whether it was clearly established both that the plaintiff spoke on a matter of public concern and that his interest in speaking outweighed the City's interest in prohibiting his

speech. As discussed in Parts I.A and I.B, each of those issues depends on the resolution of a case-specific factor analysis.

The plaintiff is correct that Hudson needed only "fair warning" that his conduct was unconstitutional, (Doc. 42 at 19-20), but he has made little effort to demonstrate that this standard is satisfied. He simply notes that reporting government misconduct is a core concern of the First Amendment, (*id.* at 21-22), while ignoring that even core public speech may be deemed private depending on the context in which the speech is made and the motivation of the speaker, and he further ignores the factors relevant to the *Pickering* balance.

The Court does not rule that the plaintiff could not have presented a persuasive argument concerning qualified immunity, only that he has not done so. Whatever pitch might have been made in that regard, the plaintiff has not advanced it, and the Court will not raise or support arguments on his behalf.

"Because qualified immunity is only a defense to personal liability for monetary awards resulting from government officials performing discretionary functions, qualified immunity may not be effectively asserted as a defense to a claim for declaratory or injunctive relief." *Ratliff v. DeKalb County*, 62 F.3d 338, 340 n.4 (11th Cir. 1995). The amended complaint seeks both declaratory and injunctive relief from Hudson. (Doc. 19 at 7-8). Hudson's qualified immunity does not insulate him from exposure to these non-monetary forms of relief.

### F. Summary.

The plaintiff's First Amendment claim fails because he is unable to create a jury issue as to whether Hudson recommended his termination, or offered testimony at his pre-disciplinary hearing, based on a retaliatory motive. Even had the plaintiff created such a jury issue, his claim would fail as to each defendant (except as to Hudson for equitable relief) for the reasons set forth in Part I.E.

## II. Equal Protection.

The defendants assume the plaintiff has legally "abandoned" this claim by not addressing it in his brief in opposition to summary judgment. (Doc. 45 at 1). As the Court has frequently observed, that is not the law. *E.g., Whitt v. Baldwin County Mental Health Center*, 2013 WL 6511856 at *3 n.6 (S.D. Ala. 2013). "[S]ummary judgment cannot be granted by default." Fed. R. Civ. P. 56 advisory committee notes to 2010 amendments to Rule 56(e). "[T]he district court cannot base the entry of summary judgment on the mere fact that the motion was unopposed, but, rather, must consider the merits of the motion." *United States v. One Piece of Real Property*, 363 F.3d 1099, 1101 (11th Cir. 2004); *accord Howard v. Gee*, 538 Fed. Appx. 884, 891 (11th Cir. 2013).[18]

The defendants next argue this claim should be dismissed because the plaintiff "does not plead with the required specificity." (Doc. 36 at 22). But the defendants' motion invokes only Rule 56, which is not a rule of pleading. Relief under Rule 56 – which is all the defendants have requested – is proper only when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The defendant cannot utilize Rule 56 to challenge a perceived pleading deficiency.

While most equal protection challenges are brought based on membership in a protected category, such a challenge may also be brought by a "class of one," when "the plaintiff alleges that she has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000). However, and as the defendants note, (Doc. 35 at 23), "such a 'class-of-one'

---

[18] The defendants appear to believe that *Coalition for the Abolition of Marijuana Prohibition v. City of Atlanta*, 219 F.3d 1301 (11th Cir. 2000), and *Lyes v. City of Riviera Beach*, 126 F.3d 1380 (11th Cir. 1997), support their position. As the Court has explained in previous opinions, neither does so. *E.g., Gailes v. Marengo County Sheriff's Department*, 916 F. Supp. 2d 1238, 1241-42 (S.D. Ala. 2013); *Mariano v. Potter*, 2006 WL 907772 at *9 n.15 (S.D. Ala. 2006).

theory of equal protection has no place in the public employment context."
*Engquist v. Oregon Department of Agriculture*, 553 U.S. 591, 594 (2008). The
plaintiff therefore can pursue only an equal protection claim based on his
membership in a protected category.

The defendants suggest that, because the amended complaint does not
allege that the plaintiff is a member of a protected class, he cannot pursue a claim
based on such membership and thus can pursue no equal protection claim at all.
(Doc. 35 at 23). The defendants cite no authority for this unusual proposition,
which the Court accordingly declines to credit.[19]

The defendants next assert that the plaintiff's equal protection claim is
"nothing more than a restatement of [his] First Amendment claim." (Doc. 35 at
23). But the single case on which they rely says only that, when an equal
protection claim alleges the plaintiff was retaliated against "because of her
expressive activity, that claim arises under the First Amendment." *Watkins v.
Bowden*, 105 F.3d 1344, 1354 (11th Cir. 1997). The defendants have done nothing
to show that the plaintiff's equal protection claim is simply that he was treated
differently from persons who did not engage in protected speech (as opposed to,
say, that he was treated differently from persons not sharing his race or gender).

The amended complaint does not identify the respects as to which the
plaintiff claims he was treated less favorably than others. The defendants identify
these respects as involving: (1) termination; (2) promotion; (3) vehicle; (4)
uniform allotment; (5) continuing education; and (6) back-up assistance. (Doc. 35
at 6-7). The deposition excerpts to which the defendants cite do not fully support

---

[19] In a related vein, the defendants complain that the plaintiff "provides no factual
basis" for asserting he is in a protected category. (Doc. 35 at 8). The defendants cite
nothing reflecting that they asked the plaintiff to identify the protected categories on
which he bases his equal protection claim and that he was unable or unwilling to do so,
and they cannot convert gaps in their discovery efforts into grounds for a successful
motion for summary judgment.

this listing, nor do they limit the plaintiff's claim to these particulars. Nevertheless, the Court considers them.

As to these particulars, the defendants argue that the plaintiff "can present no evidence that he was treated less favorably than similarly situated employees." (Doc. 35 at 23-24). To the extent the plaintiff bases his equal protection claim on assertions he was treated less favorably with respect to promotion and continuing education, the defendants are correct. Hudson has testified he promoted the best-qualified person, (Hudson Affidavit, ¶ 19), and the plaintiff does not assert he was equally or better qualified than the successful applicant. (Plaintiff Deposition at 174-75). As to continuing education, the plaintiff complains only that he had to find courses on his own. (*Id*. at 259-61). Hudson has testified that all officers had to find courses on their own, (Hudson Affidavit, ¶ 11), and the plaintiff admits he has no evidence to the contrary. (Plaintiff Deposition at 261).

As to the remaining particulars, the defendants have not carried their initial burden on motion for summary judgment. Hudson testified that the plaintiff's vehicle was "the equivalent of anyone else's," (Hudson Affidavit, ¶ 10), but the plaintiff testified that his was older than those of other officers. (Plaintiff Deposition at 253-54). Hudson testified that all officers got the same uniform allotment, (Hudson Affidavit, ¶ 9),[20] but the plaintiff testified that others received more. (Plaintiff Deposition at 257-58).[21] Hudson's testimony thus does no more than set up a conflict in the evidence, which cannot be resolved on motion for summary judgment. With respect to the failure to provide back-up assistance, Hudson testified only that he is unaware of any such incident, (Hudson Affidavit,

_____

[20] The maximum annual allotment was $350. (Hudson Affidavit, ¶ 9). The plaintiff denies receiving an allotment for 2011 or 2012, (Plaintiff Deposition at 258), so his maximum loss is $700.

[21] The defendants assert that the plaintiff stated he "does not know whether other officers got their allotment." (Doc. 35 at 7). In fact, he stated only that he did not "know of any other officers that *didn't* get their allotment." (Plaintiff Deposition at 259 (emphasis added)).

¶ 12), which fails even to create a conflict in the evidence.  Finally, the defendants do not identify evidence that could preclude the plaintiff from showing that similarly situated employees have not been terminated.  (Doc. 35 at 6).[22]

The defendants expressly limit their challenge to municipal liability to the plaintiff's First Amendment and due process claims.  (Doc. 35 at 10-11). Therefore, no question of municipal liability vel non is before the Court with respect to the equal protection claim.

In contrast, Hudson and Hamilton invoke qualified immunity "for any federal claim brought against them."  (Doc. 33 at 4).  The authorities cited in Part I.D.3.b(i) establish that they acted within their discretionary authority with respect to the particulars of the plaintiff's equal protection claim, a conclusion bolstered by the plaintiff's failure to dispute that they did so.  The plaintiff makes no effort to carry his burden to show it was clearly established in 2012 that the individual defendants' conduct violated clearly established constitutional law, and the Court will not intercede on his behalf.

In summary, the defendants are entitled to summary judgment on the plaintiff's equal protection claim to the extent that claim is based on a class-of-one theory and to the extent based on unequal treatment concerning promotion or continuing education.  In addition, Hudson and Hamilton are entitled to summary judgment to the extent the plaintiff seeks monetary relief from them under this claim.  In all other respects, the defendants are not entitled to summary judgment.

## III.  Due Process.

The defendants first repeat their arguments that the plaintiff abandoned this claim by not responding to their motion and that the claim was inadequately

---

[22] The defendants assume the plaintiff's only comparators concerning termination are the other officers associated with the television incident.  (Doc. 35 at 6).  But the deposition testimony to which the defendants cite addresses the plaintiff's due process claim, not his equal protection claim.  (Plaintiff Deposition at 271).

pleaded. (Doc. 35 at 22; Doc. 45 at 1). These arguments fail for reasons set forth in Part II.

The plaintiff limits this claim to the procedures surrounding his termination, including the failure to comply with certain unspecified state-prescribed procedures. (Plaintiff Deposition at 271-73). The defendants respond that due process requires no more than notice and an opportunity to be heard and that the plaintiff was provided both. (Doc. 35 at 24-25). As the defendants suggest, the violation of state procedures does not of itself support a federal due process claim; it is only when the violation of those procedures also constitutes a failure to provide notice and an opportunity to be heard (the federal constitutional lodestars) that a due process claim will arise. *E.g., American Civil Liberties Union, Inc. v. Miami-Dade County School Board*, 557 F.3d 1177, 1229 (11th Cir. 2009); *Harris v. Birmingham Board of Education*, 817 F.2d 1525, 1527-28 (11th Cir. 1987). Because it is uncontroverted that the plaintiff received notice and an opportunity to be heard,[23] he cannot base his due process claim on a failure to comply with state procedures.

The plaintiff, however, makes a second objection, complaining that the grievance committee was "a biased group." (Plaintiff Deposition at 271-73). Because, "in the case of an employment termination case, due process [does not] require the state to provide an impartial decisionmaker at the pre-termination hearing," it follows that "[a] demonstration that the decisionmaker was biased … is not tantamount to a demonstration that there has been a denial of procedural due process." *McKinney v. Pate*, 20 F.3d 1550, 1562 (11th Cir. 1994) (en banc) (internal quotes omitted). However, "the state's refusal to provide a means to correct any error resulting from the bias would engender a procedural due process violation." *Id.* at 1563. Because the defendants have not addressed the plaintiff's assertion of bias, they cannot obtain summary judgment on the merits of the due process claim.

---

[23] (Cooke Affidavit, Exhibits 1-4; Plaintiff Deposition at 186-87, 245-46).

The defendants point out that the plaintiff has no evidence the City has a custom or policy of denying employees due process in pre-disciplinary hearings. (Doc. 35 at 10-11). Because the plaintiff identifies no such evidence, (Doc. 42 at 16-18), he cannot establish municipal liability, and the City is entitled to summary judgment.

The Court has been cited no evidence that the individual defendants had anything to do with the creation, composition or bias of the grievance committee. However, Hudson and Hamilton do not seek summary judgment on that ground; instead, they re-assert qualified immunity. Because they have made no effort to show that any involvement they may have had in the creation, composition or bias of the grievance committee fell within their discretionary authority, their argument fails.

In summary, the City is entitled to summary judgment on the plaintiff's due process claim, and Hudson and Hamilton are entitled to summary judgment on that claim to the extent based on anything other than a biased grievance committee.

## IV. Outrage.

"The four elements of the tort of intentional infliction of emotional distress, which is also known as the tort of outrage, are: (1) the actor intended to inflict emotional distress, or knew or should have known that emotional distress was likely to result from his conduct; (2) the conduct was extreme and outrageous; (3) the defendant's actions caused the plaintiff distress; and (4) the distress was severe." *Martin v. Hodges Chapel, LLC*, 89 So. 3d 756, 763 (Ala. Civ. App. 2011) (internal quotes omitted). The defendants confine their attack to the second element. (Doc. 35 at 29-30).

"By extreme we refer to conduct so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized society." *Horne v. TGM Associates,*

*L.P.*, 56 So. 3d 615, 630 (Ala. 2010) (internal quotes omitted). "Recovery of damages for the tort of outrage is limited to the most reprehensible situations." *State Farm Automobile Insurance Co. v. Morris*, 612 So. 2d 440, 443 (Ala. 1993) (internal quotes omitted). "This Court has consistently held that the tort of outrage is a very limited cause of action that is available only in the most egregious circumstances." *Thomas v. BSE Industrial Contractors, Inc.*, 624 So. 2d 1041, 1044 (Ala. 1993).

Indeed, "[t]he tort of outrage … is so limited that this Court has recognized it in regard to only three kinds of conduct: (1) wrongful conduct in the family-burial context [citation omitted]; (2) barbaric methods employed to coerce an insurance settlement [citation omitted]; and (3) egregious sexual harassment [citation omitted]." *O'Rear v. B.H.*, 69 So. 3d 106, 118 (Ala. 2011) (internal quotes omitted). To say that the tort is "extremely limited" is "not to say, however, that the tort of outrage is viable in only the three circumstances noted" above. *Ex parte Bole*, 103 So. 3d 40, 52 (Ala. 2012) (internal quotes omitted).

The amended complaint limits the basis of the plaintiff's outrage claim to "[t]he conduct of Defendants Hudson and Hamilton as supervisory employees, as set out above." (Doc. 19 at 6). Their conduct as supervisory employees vis-à-vis the plaintiff, as set out in the amended complaint, is that, in retaliation for his exercise of First Amendment rights, they assigned him faulty equipment (which the plaintiff in deposition limited to his vehicle), took away his investigator's badge, refused his request for new uniforms, refused assistance with obtaining continuing education, and recommended his termination. (*Id*. at 3). The defendants argue that such conduct in the employment context is not extreme and outrageous. (Doc. 35 at 30). The plaintiff offers no response.[24]

---

[24] In his opposition to the motion for summary judgment on the state claims, the plaintiff addresses only the defendants' invocation of various immunities. (Doc. 42 at 23-27).

As discussed in Part I.C.2, the plaintiff cannot prove that Hudson retaliated against him by recommending his termination or by testifying at his pre-disciplinary hearing. As discussed in Part I.A.3, it is uncontroverted that Hudson did not retaliate against the plaintiff by moving him from investigations to patrol but simply acceded to a judge's request. As discussed in Part II, it is uncontroverted that Hudson treated the plaintiff equally with all other officers with respect to continuing education. The plaintiff thus cannot rely on such incidents to support his outrage claim.

The only incidents of retaliation alleged in the amended complaint as to which it remains possible for the plaintiff to prove a retaliatory motive (and thus support an outrage claim) are (a) furnishing the plaintiff an older vehicle than other officers; and (b) withholding no more than $700 of uniform allowance that other officers received. *See* Part II, *supra*. Even if the plaintiff was treated differently in these respects based on retaliation for exercising his First Amendment rights, the defendants' conduct as a matter of law does not rise to the level necessary to support an outrage claim.

"[W]hile the conduct alleged in [the plaintiff's] affidavit may amount to an assault, or to a violation of her [Fourth Amendment] constitutional rights, it does not follow that the same conduct necessarily constitutes extreme and outrageous conduct sufficient to support an action for intentional infliction of emotional distress." *Newton v. Town of Columbia*, 695 So. 2d 1213, 1218 (Ala. Civ. App. 1997). More specifically, "[f]ailing to hire someone in retaliation for protected speech does not go beyond all possible bounds of decency such that it should be regarded as atrocious and utterly intolerable in a civilized society." *Camp v. Correctional Medical Services, Inc.*, 668 F. Supp. 2d 1338, 1365 (M.D. Ala. 2009) (internal quotes omitted).

Construing Alabama law, the Court has concluded that, "[w]here a plaintiff complains that her discharge contravenes public policy, particularly if the discharge was the culmination of a protracted pattern of discrimination in violation

of public policy, she may properly pursue a claim of outrage because the violation of public policy furnishes the requisite sound of fury to accompany the termination." *Lees v. Sea Breeze Health Care Center, Inc*., 391 F. Supp. 2d 1103, 1107 (S.D. Ala. 2005) (internal quotes omitted). As the Court noted, however, "[t]his line of authority may be contrasted with, and limited by, another strand of caselaw suggesting that being subjected to unlawful discrimination over an abbreviated time period, or facing unlawful conduct falling short of discharge, may be inadequate to sustain a claim for outrage under Alabama law, even if the employer's acts otherwise are irreconcilable with sound public policy." *Id*. at 1107 n.3.

The plaintiff's outrage claim cannot be based on his termination, since he has no evidence of an underlying retaliatory motive. Being assigned an older vehicle and missing out on $700 of uniform assistance, even if based on a retaliatory motive, is "unlawful conduct falling short of discharge" and so will not support an outrage claim even if retaliation for the exercise of First Amendment rights "contravenes public policy" within the contemplation of Alabama law concerning the tort of outrage.

Alabama law "does not recognize recovery for mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities." *Ex parte Bole*, 103 So. 3d at 52 (internal quotes omitted). In *Mooney v. Henderson and Walton Women's Center-East, Inc*., 684 So. 2d 1340 (Ala. Civ. App. 1996), the plaintiff doctors' contract with the defendant medical practice allowed them to continue in the practice for 90 days after giving notice of intent to terminate. In violation of the contract, when the plaintiffs gave notice the defendant immediately deemed the contract ended, refused to let the plaintiffs see patients, escorted them out of the office, forced them to remove their furniture as patients watched, and told patients the plaintiffs were unavailable. *Id*. at 1342-44. The appellate court held that this conduct "amounts to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities." *Id*. at 1344. In light of *Mooney*, being assigned

an older vehicle and being denied $700 in uniform assistance, however inappropriate, cannot rise to the level of actionable, extreme and outrageous conduct, beyond all possible bounds of decency and utterly intolerable in a civilized society.  For want of such conduct, the plaintiff's claim must fail.

## V.  Negligent Employment.

Count Four alleges that the City tortiously retained, supervised and failed to train Hudson and Hamilton "on violating an individual's right to free speech." (Doc. 19 at 7).  The defendants argue that no such claim can be maintained without " a finding of an underlying tort" by Hudson or Hamilton.  (Doc. 35 at 28).  The plaintiff again fails to respond.

"[A] party alleging negligent supervision and hiring must prove the underlying wrongful conduct of the defendant's agents."  *Flying J Fish Farm v. Peoples Bank*, 12 So. 3d 1185, 1196 (Ala. 2008) (internal quotes omitted).  The same is true of claims of negligent training.  *Bailey v. GMRI, Inc*., 2005 WL 1570289 at *4 & n.12 (S.D. Ala. 2005).  When the underlying claims are dismissed on motion for summary judgment, summary judgment is likewise required with respect to any negligent employment claim.  *Flying J*, 12 So. 3d at 1196.

Count Four expressly limits the underlying wrong to retaliation.  Only Counts One and Three are based on retaliation and, as discussed in Parts I and IV, the defendants are entitled to summary judgment as to both counts.  The defendants are therefore entitled to summary judgment on Count Four as well.[25]

---

[25] Although Count Two survives the instant motion to some degree, it is not based on retaliation and so is not the subject of Count Four.  Even if it were, the result would be the same because, as the Court has previously held,  "the underlying conduct must constitute a common-law, Alabama tort committed by the employee, not … a federal cause of action such as Title VII."  *Roberson v. BancorpSouth Bank, Inc*., 2013 WL 3153755 at *4 (S.D. Ala. 2013) (internal quotes omitted) (citing cases).

## CONCLUSION

For the reasons set forth above, the defendants' motion with respect to Counts One, Three and Four is **granted**. The motion with respect to the due process aspect of Count Two is **granted** as to the City and is **granted** as to Hudson and Hamilton to the extent based on anything other than a biased grievance committee. The motion with respect to the equal protection aspect of Count Two is **granted** to the extent based on a class-of-one theory; is **granted** to the extent based on unequal treatment concerning promotion or continuing education; and is **granted** as to Hudson and Hamilton to the extent the plaintiff seeks monetary relief. In all other respects, the motion for summary judgment is **denied**.[26]

DONE and ORDERED this 10th day of June, 2014.

s/ WILLIAM H. STEELE
CHIEF UNITED STATES DISTRICT JUDGE

---

[26] All that survives summary judgment is: (1) an equal protection claim against all three defendants, based on the plaintiff's membership in some still-unidentified protected category, for unequal treatment concerning termination and certain terms and conditions of employment; and (2) a due process claim against Hudson and Hamilton based on utilization of a biased grievance committee. The difficulties with these claims are many and obvious, and the plaintiff's avoidance of summary judgment in these respects is more reflective of the parties' approach to summary judgment than of any apparent merit to the claims. Indeed, it is not clear the plaintiff seriously advances them.